Approved: _Nicole Friedlander_
NICOLE FRIEDLANDER/SARAH LAI/EUN YOUNG CHOI
Assistant United States Attorneys

Before: THE HONORABLE RONALD L. ELLIS
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - X

15 MAG 2501

UNITED STATES OF AMERICA

- v. -

YURI LEBEDEV,

            Defendant.

- - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

Violations of 18 U.S.C §§ 371, 1960 and 2

COUNTY OF OFFENSE: NEW YORK

DOC #

SOUTHERN DISTRICT OF NEW YORK, ss.:

TATE JARROW, being duly sworn, deposes and says that he is a Special Agent with the United States Secret Service ("USSS" or "Secret Service") and charges as follows:

### COUNT ONE
### (Conspiracy to Operate an Unlicensed Money Transmitting Business)

1. From at least in or about April 2013 to at least in or about July 2015, in the Southern District of New York and elsewhere, YURI LEBEDEV, the defendant, and others known and unknown, unlawfully, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate 18 U.S.C. § 1960.

2. It was a part and an object of the conspiracy that YURI LEBEDEV, the defendant, and others known and unknown, unlawfully, willfully and knowingly would and did conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business, to wit, Coin.mx, d/b/a

"Collectables Club," d/b/a "Currency Enthusiasts" ("Coin.mx") in violation of Title 18, United States Code, Section 1960.

Overt Acts

3. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about April 30, 2013, a co-conspirator not named as a defendant herein ("CC-1"), established an account at a particular financial institution ("Bank-1");

    b. On or about October 17, 2013, CC-1 registered the domain name "Coin.mx" with a domain registrar;

    c. Between at least in or about October 2013 and at least in or about February 2015, YURI LEBEDEV, the defendant, exchanged emails and other electronic communications with CC-1 regarding Coin.mx;

    d. On or about May 9, 2014, LEBEDEV agreed to join the board of a credit union in part to oversee a financial account through which Coin.mx processed customer transactions;

    e. From in or about December 2013, through at least in or about November 2014, in an effort to promote Coin.mx and expand its customer base, CC-1 exchanged numerous emails with a company located in New York, New York.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Operation of an Unlicensed Money Transmitting Business)**

4. From at least in or about April 2013 to at least in or about July 2015, in the Southern District of New York and elsewhere, YURI LEBEDEV, the defendant, willfully and knowingly did conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit, Coin.mx, an internet-based Bitcoin exchange business, which failed to comply with the money transmitting business registration requirements set forth in federal law and regulations.

(Title 18, United States Code, Sections 1960 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

5. I have been a Special Agent with the Secret Service for approximately five years. Since early 2011, I have been assigned to the Electronic Crimes Task Force of the Secret Service's New York Field Office. During this time, I have been involved in numerous fraud and cybercrime investigations. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

**OVERVIEW**

6. Since at least late 2013, YURI LEBEDEV, the defendant, and his co-conspirators have knowingly operated Coin.mx, a Bitcoin exchange service, in violation of federal anti-money laundering ("AML") laws and regulations, including those requiring money services businesses like Coin.mx to meet registration and reporting requirements set forth by the United States Treasury Department.

7. As set forth below, through Coin.mx, YURI LEBEDEV, the defendant, and his co-conspirators enabled their customers to exchange cash for Bitcoins, charging a fee for their service. In doing so, they knowingly exchanged cash for people whom they believed may be engaging in criminal activity, as set forth below. In total, between approximately October 2013 and January 2015, Coin.mx exchanged at least $1.8 million for Bitcoins on behalf of tens of thousands of customers.

8. YURI LEBEDEV, the defendant, and his co-conspirators engaged in substantial efforts to evade detection of their scheme by operating through a phony front-company, "Collectables Club," and maintaining corresponding phony "Collectables Club" websites. In doing so, they sought to trick the major financial institutions through which they operated into believing their unlawful Bitcoin exchange business was simply a members-only association of individuals who discussed, bought, and sold

3

collectable items, such as sports memorabilia. More recently, in an effort to evade potential scrutiny from these institutions and others, LEBEDEV and his co-conspirators acquired a federal credit union (the "Credit Union"), installed LEBEDEV and other co-conspirators on the Credit Union's Board of Directors, and transferred Coin.mx's banking operations to the Credit Union, which they operated, at least until early 2015, as a captive bank for their unlawful business.

## BACKGROUND ON BITCOINS, THE REGULATION OF BITCOIN EXCHANGERS, and COIN.MX's FAILURE TO REGISTER WITH THE U.S. TREASURY DEPARTMENT

9. Based on my experience and participation in this investigation, I am aware of the following:

 a. Bitcoins are an anonymous, decentralized form of electronic currency that exist entirely on the Internet and not in any physical form. Bitcoins are not illegal in and of themselves and have known legitimate uses. However, given the ease with which they can be used to move money anonymously, Bitcoins are also known to be used to facilitate illicit transactions and for money laundering purposes.

 b. In order to acquire Bitcoins in the first instance, a user typically must purchase them from a Bitcoin "exchanger." Typically, in exchange for a fee, Bitcoin exchangers accept payments of currency in some conventional form (cash, wire transfer, etc.) and exchange the money for a corresponding amount of Bitcoins (based on a fluctuating exchange rate); similarly, they typically exchange Bitcoins for conventional currency. Once a user acquires Bitcoins from an exchanger, the Bitcoins are kept in an electronic "wallet" associated with a Bitcoin "address," designated by a complex string of letters and numbers. (The "address" is analogous to the account number for a bank account, while the "wallet" is analogous to a bank safe where the money in the account is physically stored.) Once a Bitcoin user funds his wallet, the user can use Bitcoins in the wallet to conduct financial transactions by transferring Bitcoins over the Internet from his Bitcoin address to the Bitcoin address of another user.

10. Based on my training and experience, I know the following about regulation of Bitcoin exchangers:

 a. Exchangers of virtual currency, including Bitcoin exchangers, are considered money transmitters under federal law

4

and are subject to federal AML regulations if they do substantial business in the United States. See 31 C.F.R. § 1010.100(ff)(5); see also Department of the Treasury Financial Crimes Enforcement Network, Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, March 18, 2013, FIN-2013-G001, available at http://fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html.

   b. Specifically, federal regulations require a virtual currency exchanger to register with the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") as a money services business and to develop and maintain an effective AML program. See 31 C.F.R. §§ 1022.210, 1022.380.

   c. Maintaining an effective AML program requires filing Suspicious Activity Reports with FinCEN when appropriate, including reporting substantial transactions or patterns of transactions involving the use of the money services business to facilitate criminal activity. See 31 C.F.R. § 1022.320.

  11. In or about July 2015, I searched a United States Treasury Department database containing the names of money services businesses lawfully registered to do business in the United States. From that search, I know that Coin.mx, "Collectables Club" and "Currency Enthusiasts" are not registered, and have never been registered, as a money services business with the United States Treasury Department. In addition, I have also searched that database for the surnames of LEBEDEV and CC-1 and learned that no one with those surnames has registered a money services business.

### THE DEFENDANT AND CC-1's DESIGN OF COIN.MX AS AN ILLEGAL BITCOIN EXCHANGE BUSINESS

  12. I have reviewed emails and "chats" (another form of electronic communication) obtained pursuant to a search warrant authorized in this investigation for an email account registered in CC-1's name ("CC-1's Email Account"). I believe CC-1's Email Account to be an email account of CC-1 for many reasons, including because the user of the account identifies himself as CC-1, is referred to by others as CC-1 (including with reference to CC-1's education and employment history, with which I am familiar based on this investigation), and provides others with a copy of his driver's license, which based on my review matches that registered to CC-1 with the Florida Department of Motor

5

Vehicles. From this review, I learned, in substance and in part, that:

     a. Beginning in or about 2013, with various individuals, CC-1 discussed his plan to develop an internet-based Bitcoin exchange, sought funding for this new business, and thereafter explained that he had obtained funding to develop it. CC-1 also recruited managers and employees for his new Bitcoin exchange, including YURI LEBEDEV, the defendant, as set forth below. Among other things, these communications reveal that CC-1 and his financial backers recognized from the outset that CC-1 intended to operate an illegal business. For example:

          i. On or about September 30, 2013, CC-1 described his new business to an individual from whom he sought to obtain funding, explaining that it would be "for buying and selling" Bitcoins, "like a transmitter service."[1] Later that day, the individual explained that he would not risk investing in CC-1's business because, while "I like BTC [Bitcoin]. . . I don't want to lose investment to the gov[ernment]. . . [It] would sting to [sic] bad if something happened."

          ii. On or about October 14, 2013, CC-1 told another individual that while he had obtained a funding commitment from certain overseas investors, those investors "don't think the U.S. will like it, and they would not sleep if something would happen to me."[2]

---

[1] CC-1 described his business on numerous other occasions as a Bitcoin exchange business, including with reference to his understanding that U.S. law required it to be licensed. For example, in April 2014, in communicating with a particular overseas business, CC-1 described Coin.mx as "a digital money/bitcoin exchange" that was "interested in offering margin trading as well as having the ability to transfer money in and out of our members banks accounts [sic]. In the US the licenses would be a broker dealer and money transmitting."

[2] In January 2015, in an email in which he sought to convince a particular payment processor to do business with Coin.mx, CC-1 suggested that CC-1 had "authority" to do business without a license because Coin.mx was a so-called "private member association," and that CC-1 notified unspecified federal and state authorities "by certified mail" of the operation of the business. Contrary to this claim that CC-1 believed he had authority to run an unlicensed Bitcoin exchange, substantial

6

b. In or about late September 2013, CC-1 recruited LEBEDEV to manage the development of a computer programming platform to support CC-1's new Bitcoin-exchange business. For example, on or about October 17, 2013, CC-1 told LEBEDEV that "Coin.mx is going to be the brand," and that "it's mine now. . . and yours." CC-1 anticipated that Coin.mx would exchange "every currency and every digital currency," envisioning it as "a worldwide payment system with immediate funds availability." For his part, LEBEDEV expressed that he hoped to be "the founding father and the architect" of the Coin.mx electronic platform.

c. In exchange for payments, LEBEDEV agreed to, and did, become the "architect" of the Coin.mx electronic platform. For example, in certain of the communications:

i. LEBEDEV discussed his plan to rent, and his actual rental of, computer servers in the United States and abroad through which Coin.mx would and (based on my review of other evidence obtained in this investigation) did operate;

ii. LEBEDEV discussed his design of requisite programming specifications for the Coin.mx electronic exchange platform;

iii. Beginning in or about November 2013, CC-1 and LEBEDEV discussed hiring computer programming contractors whom LEBEDEV recommended to assist them in developing the Coin.mx platform, and whom LEBEDEV would and did manage and communicate with in order to develop that platform; and

iv. After Coin.mx began operating in or about November 2013, LEBEDEV communicated regularly with CC-1 about maintaining, and resolving issues associated with, the programming operations of Coin.mx, and LEBEDEV and CC-1 continued to discuss potential changes to Coin.mx's computer programming infrastructure. For example, on or about February

---

evidence shows that CC-1 and LEBEDEV knowingly operated an unlawful business, including, as set forth herein, CC-1 and LEBEDEV's various references to the unlawful nature of their business, CC-1's lies to Bank-1 and Bank-2 about the nature of his business, and CC-1 and LEBEDEV's creation of a phony front-company "Collectables Club" website to create the false appearance that they were operating a collectables trading association instead of an illegal Bitcoin exchange.

7

1, 2014, LEBEDEV emailed CC-1, for discussion, a diagram showing the Coin.mx technical infrastructure for a "Regular User" and an "Advanced Trader."

   d. Like CC-1, LEBEDEV recognized that Coin.mx was operating illegally. In addition, CC-1 and LEBEDEV recognized that their customers could be using Coin.mx's services to facilitate or launder the proceeds of criminal activity, and were excited by this prospect because, in their view, it represented the possibility of additional business for Coin.mx. For example:

     i. On October 25, 2013, in discussing the development of Coin.mx, LEBEDEV complained that "the challenge" is that the "U.S. is not allowing funding for its own citizens," which, based on my experience and participation in this investigation, appears to be a reference to the fact that Coin.mx was operating in violation of federal law.

     ii. In or about late 2013, LEBEDEV and CC-1 discussed configuring the Coin.mx programming infrastructure to keep a particular major Internet search engine from learning that Coin.mx was operating through multiple connected sites. Based on the evidence set forth below regarding the phony "Collectables Club" websites, I believe this is a reference to avoiding detection of the fact that the Collectables Club websites were phony front-companies for Coin.mx.

     iii. On or about November 14, 2013, in a series of chats, LEBEDEV proposed that Coin.mx begin offering exchange services through Russia-based payment processors because "then a lot of [R]ussians can buy!!. . . and wash money as well." In response, CC-1 stated, in sum, that Coin.mx was already doing business with one or more such processors, in reply to which LEBEDEV wrote, "wow. . . how cool is that." Based on my training, experience, and participation in this investigation, I believe that in suggesting that Coin.mx enter into certain business arrangements that would encourage individuals in Russia to "wash money" through Coin.mx, LEBEDEV was expressing his hope that such arrangements would lead to Russia-based criminals using Coin.mx to launder the proceeds of their crimes.

   e. While LEBEDEV supervised the computer programming functions of Coin.mx, CC-1 maintained financial and operational control of the company, including through his beneficial ownership and control of the company's financial accounts (aspects of which CC-1 discussed and directed through these

8

emails and chats, and as further set forth below regarding CC-1's control of Coin.mx's bank accounts), and through his oversight and control of the day-to-day management of the business, as reflected in numerous communications through which CC-1 recruited and hired employees, answered employees' questions about operating the Bitcoin exchange, and answered certain Bitcoin exchange customers' questions directly.

### THE COIN.MX WEBSITE AND THE UNDERCOVER COIN.MX PURCHASES

13. On multiple occasions between approximately late 2014 and July 2015, I visited the website www.coin.mx (the "Coin.mx Website," last visited July 16, 2015). According to the Coin.mx Website, Coin.mx was an "international . . . exchange that allows you to securely buy, use, and accept bitcoin and other digital currencies," and that accepts "CASH, WIRE & BANK DIRECT" as well as "ALL CREDIT CARDS." The website further claimed that Coin.mx "is open to 'anyone'" and that, as of in or about October 2014, Coin.mx had over "70,000 members!"

14. From reviewing records of an internet domain registrar (the "Domain Registrar") for the domain name "coin.mx," I learned that on or about October 17, 2013, an individual with CC-1's name and with a certain address in Florida (the "Florida Address") registered the internet domain name "coin.mx" using CC-1's Email Account. The Florida Address is the same as the address for CC-1 on file with the Florida Department of Motor Vehicles. Accordingly, I believe that CC-1 registered the domain name "coin.mx" used by the Coin.mx Website.

15. In or about November 2014, acting in an undercover capacity in New York, New York, I attempted to exchange U.S. dollars for Bitcoins through the Coin.mx Website, in the process of which I was asked through the website to sign a "Collectables Club Membership Agreement." According to the agreement, "Collectables Club" members "seek to help each other achieve information and education pertaining to collection and trading of memorabilia." After I agreed electronically through the Coin.mx Website to abide by that agreement, Coin.mx enabled me to exchange U.S. dollars for Bitcoins through the Coin.mx Website, which I subsequently did, as directed through the Coin.mx Website, in a successful undercover transaction. Several days later, through the Coin.mx Website, I exchanged a portion of those Bitcoins back to U.S. dollars, which I successfully sent via wire transfer to, and then withdrew from, an undercover bank account. For each of these exchange transactions, Coin.mx charged a fee.

16.  In or about January 2015, I again successfully exchanged U.S. dollars for Bitcoins through the Coin.mx Website. In addition, in or about July 2015, through the Coin.mx website, I accessed my Coin.mx account, and observed that it appeared to be functioning.

**THE CO-CONSPIRATORS' EFFORTS TO EVADE DETECTION OF THEIR SCHEME THROUGH THE PHONY "COLLECTABLES CLUB" FRONT-COMPANY**

17.  From reviewing bank and other records obtained in this investigation, I have learned that YURI LEBEDEV, the defendant, and CC-1 attempted to evade detection of their unlawful Bitcoin exchange business by operating through a phony front-company, "Collectables Club," for which CC-1 maintained bank accounts and LEBEDEV maintained phony websites.

18.  From reviewing records of the Florida Department of State, Division of Corporations, I learned that CC-1 registered "Collectables Club" as a "doing business as" name with the State of Florida on or about July 15, 2013.

19.  From reviewing bank records obtained in this investigation, I learned the following:

    a.  In or about August and October 2013, respectively, CC-1 opened bank accounts, on which he was the sole signatory, at Bank-1 and another major U.S. financial institution ("Bank-2"),[3] each in the name "Collectables Club" (collectively, the "Bank-1 and -2 Collectables Club Accounts"), which in each case CC-1 claimed was a members-only association of collectables trading enthusiasts. For example, Bank-2 records reflect that in opening the Bank-2 Collectables Club Account, CC-1 informed Bank-2 that he was the founder and President of Collectables Club, which existed "to discuss various collectible items, items such as cars, coins, stamps, sports memorabilia, music instruments, etc.," and to exchange advice "on memorabilia trading, buying, selling, and information on events and meetings across the United States." Further, in terms of the purpose for which he would use the account, CC-1 told Bank-2 that "a small fee is charged for joining the club which is used to pay for meetings or retreat[s] the club would

---

[3] The Bank-2 records reflect that CC-1 opened and operated more than one such account at Bank-2. For ease of reference, these accounts are referred to collectively herein as the "Bank-2 Collectables Club Account."

10

have on an annual basis. . . this account is use[d] to collect the membership dues and pay for gatherings."

   b.   In truth and in fact, CC-1, YURI LEBEDEV, the defendant, and their co-conspirators used the Bank-1 and -2 Collectables Club Accounts solely to operate Coin.mx. Specifically, between approximately September 2013 and mid-2014, through these accounts, CC-1, LEBEDEV and their co-conspirators exchanged well over $1 million for Bitcoins on behalf of Coin.mx customers. In particular, among other things, the Bank-1 and -2 Collectables Club Account records show thousands of incoming deposits in varying amounts from individuals, some of whom, in wire transfer instructions, noted that their payment was "for Bitcoins." Similarly, the records show numerous payments to entities which I know, based on my training and experience, sell Bitcoins in exchange for U.S. dollars and other currency.

   20.   Emails in the CC-1 Email Account reflect that CC-1 directed certain customers to make certain wire transfers specifically in an effort to evade detection of the unlawful scheme. For example, by email dated November 28, 2013, a particular customer ("Customer-1") informed CC-1 that he was wiring $100,000 to the Bank-1 Collectables Club Account. In response, CC-1 wrote, "can you see if you can put a stop to it? . . . You may wire 20k to [Bank-1], it will be credited immediately. The rest must go to bulgaria please. We hope you understand the concerns. If the US was not so damn screwed up about this stuff, we wouldn't have to deal with this." Based on my training and experience, and my participation in this investigation, I believe that in providing these instructions, CC-1 demonstrated concern that due to its substantial size, a wire transfer of $100,000 could cause Bank-1 to scrutinize the transaction more closely, and thereby to discover that CC-1 was using the Collectables Club Account to operate an unlicensed Bitcoin exchange, and not a small collectables trading association, as CC-1 had falsely represented to Bank-1.

   21.   The CC-1 Email Account contains additional evidence that CC-1 sought to avoid detection of the unlawful scheme. For example, based on CC-1 Email Account communications that I have reviewed, on or about November 26, 2013, Customer-1 indicated that, in order to purchase thousands of dollars worth of Bitcoins, Customer-1 intended to instruct Customer-1's bank to wire money to Bank-1 for the benefit of "Collectables Club P.M.A.," which had the "nickname" of "Coin.mx." CC-1 replied, "I would **not** put coin.mx in there. Put Collectpma.com" (emphasis in original). In doing so, I believe, based on my

11

training, experience, and participation in this investigation, that CC-1 demonstrated his knowledge that Bank-1 did not know that the Bank-1 Collectables Club Account was being used to operate CC-1's illegal Coin.mx business, as well his intent to prevent Bank-1 from learning that fact.

22. I have learned that in a further effort to trick financial institutions and others into believing they were operating a collectables trading association, instead of an unlawful Bitcoin exchange business, YURI LEBEDEV, the defendant, and CC-1 maintained phony "Collectables Club" websites. For example:

    a. From reviewing the CC-1 Email Account, I learned that in or about April 2014, CC-1 referred a representative of Bank-1 to the website "http://collectpma.com" "so you can have a look at how everything works and the items that are available." In or about June 2015, I visited that website (the "Collectables Club Website") and observed that it stated prominently that it was the website of "Collectables Club," purportedly a members-only club that enables members to "buy and sell" antiques, "sports cards and memorabilia," "coins and currency," and other items through an online auction process. The website further claimed that the "Association" made money by charging 15 percent of the value of the transactions conducted through them, and contained purported links enabling website visitors to sign up with, and become members of, Collectables Club. However, at that time, when I attempted to sign up with, and become a member of, Collectables Club through one of the Collectables Club Websites, after completing the purported online membership form, I never received any communication from Collectables Club or was otherwise able to become a Collectables Club member. Further, I sent an electronic message to "Collectables Club" through the purported contact form provided on the relevant Collectables Club Website, but never received any response.

    b. I have reviewed emails obtained pursuant to a search warrant authorized in this investigation for an email account registered in the name of YURI LEBEDEV, the defendant ("LEBEDEV's Email Account"). I believe LEBEDEV's Email Account to be an email account used by LEBEDEV for many reasons, including because the user of the account identifies himself by LEBEDEV's name, and is referred to by others, including CC-1, as LEBEDEV (including with reference to LEBEDEV's employment history, with which I am familiar based on this investigation). From these emails, I learned, among other things, that LEBEDEV was tasked by CC-1 with maintaining the phony Collectables Club

Websites in furtherance of the unlawful Coin.mx business, and that LEBEDEV did, in fact, maintain those websites, including by making changes to the websites at CC-1's direction.

## CC-1'S ACQUISITION OF A FEDERAL CREDIT UNION IN FURTHERANCE OF THE UNLAWFUL SCHEME

23. As further discussed below, based on certain emails in CC-1's Email Account, and information obtained from the National Credit Union Administration, I learned that in or about late 2014, CC-1 obtained beneficial control of the Credit Union, a small credit union in New Jersey with primarily low-income members, in order to process Automated Clearing House ("ACH") transactions (i.e., electronic credit and debit transactions) for the unlawful Coin.mx scheme, among other things. To do so, among other things, CC-1 made a payment to a senior executive at the credit union (the "Executive"), as reflected in bank records which I have reviewed, and also installed certain individuals close to him, including YURI LEBEDEV, the defendant, on the Credit Union's board of directors. Below, except as otherwise noted, are relevant portions of some of the relevant communications from CC-1'S Email Account:

    a. In or about mid-2014, CC-1 engaged in numerous emails and chats with certain other individuals about acquiring a small credit union through which he could operate his Bitcoin exchange business. On or about May 9, 2014, CC-1 sent an email to LEBEDEV in which CC-1 described the Credit Union as "a small credit union 107 members no full time employees," and further noted that he met with Credit Union representatives and "came to an agreement that we would be able to have control of the credit union." CC-1 then invited LEBEDEV to become an advisory member on the board, for which LEBEDEV would be paid $5,000. LEBEDEV responded, "I am most definitely in!" and "I won't disappoint you[.]"

    b. Thereafter, as reflected in numerous emails and chats in the CC-1 Email Account, CC-1 and LEBEDEV began to process ACH transactions for Coin.mx through a payment processor (the "Payment Processor") which, with CC-1's assistance, opened an account at the Credit Union, and used that account to process ACH transactions for Coin.mx and other purported businesses.

    c. In October 2014, in a conversation with CC-1, LEBEDEV, and others which CC-1 recorded (a copy of which was maintained in an electronic file-storage account connected to the CC-1 Email Account, and which I reviewed pursuant to a

13

judicially authorized search warrant), the Executive privately admitted that notwithstanding the Executive's titular role, "I'm going to say it. . .it's your credit union. . . I believe how I've operated from day one is it's your credit union." The Executive further worried about the "tap dancing" he and others were doing to avoid raising concern among federal regulators about the payment processing activity that CC-1 and others were conducting through the Credit Union. As the Executive further admitted, "We can't certify that all the people we let [pass] money through this credit union. . . weren't doing something illegally with the money." The Executive further acknowledged, in sum and substance, that with respect to such payment processing activity, the Credit Union had not performed appropriate Bank Secrecy Act procedures [i.e., procedures that are required under federal law and designed in part to enable law enforcement to detect money laundering and other unlawful activity by bank customers], and as a result, the Credit Union's account may have been used in furtherance of money laundering and other crimes.

24. From speaking with representatives of the National Credit Union Association ("NCUA") and reviewing NCUA records, I learned that while the Credit Union normally handled the modest banking needs of a small group of primarily low-income local residents, and had little or no experience with the business of ACH processing, by October 2014, the Payment Processor was processing over $30 million a month in ACH transactions through its account at the Credit Union. The NCUA learned of the unusual size and scope of the activity and, in part because the Credit Union did not have the AML policies or procedures in place to handle such voluminous payment processing, forced the Credit Union to stop allowing such processing; the NCUA separately required the Credit Union to remove the new Board members. Thereafter, based on emails in the CC-1 Email Account

which I have reviewed, CC-1 found other ways to process payments for his unlawful Coin.mx business, including through an overseas payment processor.

WHEREFORE, deponent prays that an arrest warrant be issued for the above-named defendant, and that he be imprisoned or bailed, as the case may be.

_____
TATE JARROW
Special Agent
United States Secret Service

Sworn to before me this
17th day of July, 2015

_____
HONORABLE RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

15